## LOCUS BUILDING PARTNERSHIP,
*Respondent,*

*v.*

## GLADYS ENTERPRISES, INC.,
*Appellant.*

(223237; CA A23959)

662 P2d 15

Warren C. Deras, Portland, argued the cause and filed the briefs for appellant.

Neil T. Jorgenson, Portland, argued the cause for respondent. With him on the brief was Bouneff, Chally & Marshall, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

**ROSSMAN, J.**

In this FED action[1] involving a commercial lease, lessee appeals from a judgment ordering restitution of the premises to lessor. We reverse.

On August 18, 1978, lessee agreed to purchase a restaurant and bar and to lease the business premises here at issue. Pursuant to that agreement, lessee entered a five-year lease that provided for rental payments to be made on the first day of each month. The lease was later amended, effective October 15, 1978, to increase the area leased, to increase the rent and to change the rent payment date from the first to the 15th day of each month. The amendment also provided:

> "Unless otherwise directed by Lessor, all rental payments shall be made through the Citizens Branch of the United States National Bank of Oregon."

By an undated second amendment, the lease term was extended to 90 months, lessee's option to purchase the property was cancelled and the parties recited that lessee's right of first refusal had been assigned to lessor. Lessor established a checking account at the United States National Bank (bank) and provided lessee with deposit slips for that account with a note stating:

> "For your convenience, you may want to use these deposit slips in making your 15th of the month rent payments ($1,050.00)."

The trial court found, and lessor agrees, that, although the lease required payment of rent on or before the 15th day of each month, both ORS 91.090 and the lease agreement provided for an additional ten-day period within which lessee could make the payment due. Before November, 1981, rent was paid between the 15th and 25th of each month by delivery of a check and deposit slip to the bank during regular banking hours. According to lessee, in November, 1981, the business routine of the Wilkinsons, who own lessee's stock and operate the business, "was disrupted by the need to go to Medford to stay with Mrs. Wilkinson's mother who was seriously ill and believed

---

[1] *See* ORS 105.105 to 105.165.

dying." On the evening of November 25, one of the attorneys in the lessor partnership visited the Wilkinsons at their place of business and told them that they had not paid the rent and threatened "to break that sweetheart lease that you have." Mr. Wilkinson drew a check for $1,050 to lessor drawn on the bank, and made out a deposit slip to lessor's account. At 11:30 p.m., November 25, he slipped an envelope containing the check and deposit slip through the double doors at the front of the bank. The bank has a night depository box for which Wilkinson had no key, and there was no mail slot. The doors through which Wilkinson slipped the envelope open into a "bank foyer" not shared with other occupants of the building. There was testimony that in the past others had slipped various items onto the floor of the bank foyer in this fashion, including letters, loan applications and loan and contract payments.

November 26 was Thanksgiving Day. On November 27, at 7:50 a.m., a bank employe found lessee's envelope and took it to the bank's business area for processing.[2] At 10:30 a.m., two members of lessor partnership came to the bank and, on finding that lessee's payment had not yet been deposited in lessor's account, closed the account, took the envelope and rent check and returned with them to their office, which is in the same building as lessee's place of business. A letter containing the check and dated and postmarked December 1, 1981, the date this action was filed, was sent to lessee's attorney but was not received by the him until December 7. Rent checks tendered thereafter by lessee were also returned. Bank records confirmed that there were sufficient funds in lessee's account to cover all of the checks.

The trial court found that: (1) lessee had not made a timely tender of payment of the November rent on the date it was due or within the ten-day grace period provided by ORS 91.090 and the lease; (2) lessor had not accepted lessee's late payment; (3) lessee's failure to make timely payment automatically terminated the tenancy under ORS 91.090; and (4) lessor was entitled to immediate possession

---

[2] An employe of lessee went to the bank before 8:00 a.m. on November 27, to make certain that the bank had received the payment check. A bank employe told him that the check had been found and would be processed that day.

of the premises. We agree with lessee's contention that the court erred in denying its motion to dismiss on the ground that the rent was tendered or paid on November 25, 1981, and therefore will address only that assignment of error.

ORS 91.090 provides, in part:

"The failure of a tenant to pay the rent reserved by the terms of his lease for the period of *10 days, unless a different period is stipulated in the lease,* after it becomes due and payable, operates to terminate his tenancy. * * *" (Emphasis supplied.)

The lease provided the *same* ten-day grace period. The rent for the period November 16 through December 15, 1981, was due on November 15. Thus, given the grace period and computing the time in accordance with the provisons of ORS 174.120,[3] lessee would not have been in default in payment of rent until midnight of November 25, 1981. *See Loe v. Klein et al,* 191 Or 654, 658-59, 233 P2d 209 (1951) (construing nearly identical statutes).[4] Nevertheless, the trial court concluded in its letter opinion, and lessor argues on appeal, that the resolution of the dispute requires a consideration of ORS 74.1070(2) and 74.1040(1)(c), which provide:

" 'Banking day' means that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions." ORS 74.1040(1)(c).

"Any item or deposit of money received on any day after a cutoff hour so fixed or *after the close of the banking day may be treated as being received at the opening of the next banking day."* (Emphasis added.) ORS 74.1070(2).

The trial court held that, pursuant to the lease and those statutes, "defendant did not make a timely deposit of the November rent check."

■ ■ The lease term providing for rental payments to be made through the bank does not, without more, operate to

---

[3] ORS 174.120 provides:

"The time within which an act is to be done, as provided in the civil procedure statutes but except as otherwise provided in ORCP 10, is computed by excluding the first day and including the last unless the last day falls upon any legal holiday or on Saturday, in which case the last day is also excluded."

[4] OCLA § 8-309 and OCLA § 10-206 (as amended by Or Laws 1949, ch 287).

shorten the ten-day grace period, nor does it constitute the stipulation of a different period, *i.e.,* the end of the "banking day" on the tenth day of the period. *See* ORS 91.090. The term does establish the place where the payments are to be made and that the bank is to process the payments. However, it does not provide that the rent check is deemed to have been received under the lease at the time it is "treated as [having been] received" by the bank for banking purposes under ORS 74.1070 and not before.[5] Thus, the statutes relied on by the trial court do not control. ORS 91.090 and the lease itself provide for a ten-day grace period ending midnight of the tenth day, and no different period is stipulated. We conclude that lessee's placing of the rent check and deposit slip in the bank before midnight November 25, 1981, was a tender of payment within the statutory grace period and that, therefore, it was not in default.

Reversed.

---

[5] ORS 74.1070 provides:

"(1) *For the purpose of allowing time to process items, prove balances and make the necessary entries on its books* to determine its position for the day, a bank *may* fix *an afternoon hour* of 2 p.m. *or later* as a cutoff hour for the handling of money and items and the making of entries on its books.

"(2) Any item or deposit of money received on any day after a cutoff hour so fixed or after the close of the banking day may be *treated* as being *received* at the opening of the next banking day." (Emphasis supplied.)

ORS 74.1040(1)(b) defines "afternoon" as the period of a day between noon and midnight.